IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| DARIAN STANFORD, as Personal Representative of the ESTATE OF AIMIE ZDRANTAN, and A.B., by and through her Guardian, Stelian Zdrantan, | ) ) ) ) | Civil No.:3:16-cv-01718-JE |
| Plaintiffs, | ) ) | OPINION AND ORDER |
| v. | ) ) | |
| WASHINGTON COUNTY, a municipal corporation of the State of Oregon; WASHINGTON COUNTY COMMUNITY CORRECTIONS CENTER, a municipal corporation of the State of Oregon; STEVE BERGER, an individual; KARLEIGH MOLLAHAN, an individual; PETER DAN, an individual; and DOREEN DREYER, an individual, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) ) | |

Shenoa L. Payne
Kirc T. Emerson
Richardson Wright LLP
805 SW Broadway, Suite 470
Portland, OR 97205

John M. Coletti , III
Paulson Coletti
1022 NW Marshall Street, Unit 450
Portland, OR 97209

Attorneys for Plaintiffs

Christopher A. Gilmore
Kimberly Stuart
Office of Washington County Counsel
155 N. First Ave.
Suite 340, MS 24
Hillsboro, OR 97124

Gerald L. Warren
Law Office of Gerald L. Warren and Associates
901 Capitol Street NE
Salem, OR 97301

      Attorneys for Defendants


JELDERKS, Magistrate Judge:

      Plaintiff Darian Stanford, as Personal Representative of the Estate of Aimie Zdrantan; and Plaintiff A.B., by and through her guardian ad litem, Stelian Zdrantan, bring this action against Defendants Washington County ("the County"), Washington County Community Corrections Center ("Center"), and County employees Steve Berger, Karleigh Mollahan, Danita Gorman, Peter Dan and Doreen Dryer.  Plaintiffs allege wrongful death and negligent infliction of emotional distress claims against Defendants under state law and also assert a claim under 42 U.S.C. §1983 for alleged Fourteenth Amendment substantive due process rights violations. Pending before the Court is Defendants' motion for summary judgment.

      For the reasons set forth below, Defendants' motion is granted with respect to Plaintiff's Due Process Claim and state law claim for Negligent Infliction of Emotional Distress. The Court retains jurisdiction of Plaintiff's supplemental state law claim for wrongful death and denies Defendants' motion for summary judgment as to that claim.


## Background

      This case revolves around the death of Aimee Zdrantan, who was murdered in her

apartment by her long-time boyfriend Eric Petersen. At the time of the murder, Petersen was a resident at the Center, serving an alternative sanction sentence for a probation violation. Plaintiff A.B. is the now five-year old child of Ms. Zdrantan and Petersen and was in the apartment at the time of the murder.

## I. The Washington County Community Corrections Center

Washington County maintains the Washington County Community Corrections Center (Center) to provide eligible individuals who are serving criminal sentences transitional services and opportunities through participation in a minimum security residential work-release center. The Center thus serves as an alternative to full-time confinement. Residents of the Center are allowed the opportunity to seek treatment, establish housing for after their release, and seek employment and other community connections in order to facilitate a successful re-entry into the community. Residents are allowed to temporarily leave the Center in order to pursue these resources.

In 2014 the Center served 2,169 residents. (Berger Decl. p. 2). In that year, 84 percent of residents successfully participated through the end of their sentences in the resources offered by the Center. (Id.). New crimes of any kind by Center residents have historically been less than one percent with the commission of new crimes of violence at a fraction of one percent. (Id.).

An individual's eligibility to serve his sentence at the Center can only be considered if the sentencing court first orders that the offender is eligible for alternative sanctions. ORS 137.752. Felony sentences of more than 12 months for a violent crime or sexual offense disqualify the individual from candidacy for the Center. ORS 137.124, 137.752. Otherwise, the sentencing judge has discretion to determine if alternative sanctions are appropriate under the circumstances for the particular offender facing sentencing. A judge's order authorizing

alternative sanctions allows the offender to participate in Center programs unless he is otherwise disqualified.

After a judgment is entered authorizing alternative sanctions, the inmate is then screened for transfer from jail to the Center. The process and standards include the following: 1) an inmate in the Washington County Jail must request a transfer to the Center and pay a fee; 2) inmates "should be those that will benefit from the [Center] program opportunities and not present a risk to the public;" 3) the inmate must display and have a history of good behavior and have a low or medium classification level. (Frohnert Decl., Ex. 1, Jail Policy J-6-10).

In addition to Jail Policy, the Center has its own criteria for acceptance. Subjective criteria include that the inmate agree to adhere to Center program policy, rules and regulations; to cooperate with staff and clients; that the inmate have the mental and emotional capacity to participate in the program; and that the inmate "be in touch with reality and in control of violent behavior." (Wright Decl., Ex. 1). Every inmate entering the Center must sign a Conditions and Agreement form and comply with the eligibility criteria. Misconduct or misbehavior at the Center can result in an automatic return to jail.

Once an inmate is accepted to the Center and intake is complete, he or she attends an orientation and signs the Conditions and Agreement form. Following orientation, each resident is assigned a residential counselor who, within 48 hours of intake, meets with the resident to assess needs and develop a case plan if necessary. (Wright Decl. Exs. 4, 5). No formal case plan is required if a resident will be in the Center for less than 30 days but residents still receive directives regarding supervision requirements, treatment, and attendance in other activities through the Center. (Wright Decl. Ex. 5). During this initial meeting, the counselor is required to

identify any victims, no-contact orders, restraining orders or protective orders. (Wright Decl. Ex. 5, p. 9). The Center's policy directs that:

> Per protocol, the counselor is responsible to contact the victim . . . of record and inform them that the resident is currently in custody and will have opportunities to be out in the community. . . The counselor should document that this contact has taken place.

(Wright Decl. Ex. 5, p. 9)

Residential counselors are trained to attempt to locate the correct victim contact information in order to attempt to contact the victim but that "the reality is that doesn't always happen." (Gilmore Decl. Ex. 8, Gorman Dep. p. 18). Counselors do not reach every victim they attempt to contact but failure to contact a victim does not preclude a resident from participating in Center programs, including temporary release into the community. (Id. pp. 21-22). A resident who violates a no-contact order is immediately returned to jail. (Wright Decl. Ex. 5, p. 9).

After a seven day blackout period, residents in good standing may be given a pass by Center counselors so that they may engage in community based programs. (Wright Decl. Ex. 6). There are two categories of passes: social passes and mini-passes. Mini-passes are described in the Residential Counselor's Manual as

> generally for use on short passes of four hours or less. Mini-passes are used for the purpose of attending treatment, legal appointments, medical appointments, job interviews, self-help support groups, and personal business at counselor's discretion if eligible based on custody status.

(Wright Decl. Ex. 5, p. 26). Prior to the issuance of a mini-pass for the purpose of seeking employment, the resident must complete an additional list of requirements. (Gilmore Decl. Ex. 8, Gorman Depo. Ex. 4, p. 29). It is the policy of the Center that all qualified unemployed residents pursue gainful employment prior to their re-entry into the community and be afforded passes into the community to do so. However, counselors have discretion to authorize passes based on the

resident's "program compliance and appropriate behavior while a resident of the Center."

(Wright Decl. Exs. 5, 6).

If a resident is an hour late returning from an approved pass, Center policy directs that staff attempt to locate the resident by making contact with family, significant others, employers and/or the approved visit site. Staff are also directed to notify victims. (Wright Decl. Ex. 8, p. 3). Once a resident is three hours late, the Unauthorized Departure (UAD) process is initiated and staff are directed to notify the resident's probation officer, jail booking, and non-emergency dispatch. Staff are also required to complete a UAD procedure worksheet and an Escape/UAD Incident Report. Supervisory staff are to review the completed worksheet at the time of the UAD "to ensure all protocol is handled and appropriate phone calls are made if needed." (Id.).

In the event Center staff become aware a resident has entered an unauthorized area either inside or outside the Center, the infraction is treated as a Major Violation. (Payne Decl. Ex. 5, p. 41). A Major Violation is an internal Center disciplinary measure that can result in sanctions ranging from lengths of time on restriction to return to jail. (Wright Decl. Ex. 5, p. 15).

## II. Petersen's Transfer to the Center

On August 6, 2014, while walking with Ms. Zdrantan and A.B. in Hillsboro, Petersen was arrested on an outstanding warrant for non-compliance with his probation conditions. Although there was a no-contact order in place, Petersen and Ms. Zdrantan were living together at the time and Petersen was caring for A.B. while Ms. Zdrantan worked.

A probation violation hearing was held on August 18, 2014 in Washington County Circuit Court. Ms. Zdrantan attended the hearing. At the conclusion of the hearing, Judge Letourneau indicated in court that he would sentence Petersen to "60 days, credit for time served, alternative sanctions. Hopefully you can work at the center and, you know, get a positive start

before you hit the – hit pavement again." (Gilmore Decl. Ex. 6, p. 9). A Judgment was subsequently entered authorizing alternative sanctions.

Petersen was then returned to jail and applied for transfer to the Center. On August 20, 2018, Petersen was transferred to the Center. He met with Defendant Danita Gorman, his assigned residential counselor, on the following day. According to Gorman, there was nothing in Petersen's demeanor, behavior or responses to her inquiries that gave her any concerns about his ability to participate in Center programs. (Gorman Decl. p. 2). Gorman asked Petersen if he had contact information for the victims listed in his file and he indicated that he did not. (Id.). Gorman subsequently searched the AS400 "Chronos" log and found that the most recent phone number for Ms. Zdrantan had been disconnected. Jail records also did not have a number. After her meeting with Petersen, Gorman sent an email to his probation officer seeking valid contact information. (Gorman Depo. pp. 24, 27-28). She did not receive a response before Petersen was issued a mini-pass on August 28, 2018. (Id. at p. 25).

### III. The Events of August 28, 2014

On August 28, 2014, after the seven-day blackout period, Petersen received authorization to leave the Center to seek employment through Labor Ready. His first pass was at 5:37am which was when Labor Ready wanted potential laborers to appear. When Petersen arrived at Labor Ready early that morning, he was not able to provide sufficient forms of identification and the staff were not able to locate him in the system due to confusion regarding the spelling of his name. (Alex Depo. pp. 34-37). He was sent back to the Center and checked in at 8:25am. (Dan Depo. p. 56). Labor Ready later contacted the Center and asked that Petersen return to Labor Ready as they had located him in the system and needed him to provide updated information and his identification. (Alex Depo. pp. 17, 22). Petersen was issued a mini-pass at 9:45am in order to

go to Labor Ready. The mini-pass required him to return to the Center by 12pm.

After arriving at Labor Ready and waiting for staff to assist him, Petersen was told that he did not have the proper forms of identification with him and that he was to return to the Center. He was told that he had about 15 minutes to do so. (Id. at p. 23). Labor Ready is located three or four blocks away from the Center. Petersen left Labor Ready at approximately 10:30am. (Id. at pp. 25-26).

Instead of returning to the Center, Petersen headed in the direction of Ms. Zdrantan's apartment about two miles away. On the way he encountered Ms. Zdrantan and A.B. walking along the side of the Tualatin Valley Highway. During their encounter, they had and argument. Ms. Zdrantan called her mother, Alice Alinger, from her cell phone and part of the argument was recorded on Ms. Alinger's voicemail around 10:41 a.m. (Petersen Decl. ¶¶ 10-14; Petersen Depo. p. 17; Gilmore Decl. Ex. 11, Nos. 24, 25). Ms. Zdrantan told Petersen to leave or she would call his probation officer. Ms. Zdrantan and Petersen parted. Petersen first walked in the direction of the Center and then doubled back to walk to the apartment he had shared with Ms. Zdrantan to collect his belongings. (Petersen Decl. ¶¶ 12-13).

At the apartment, Petersen encountered Leticia Godinez, the apartment manager. He asked if Ms. Zdrantan was home and when Godinez responded that she didn't know he left to check. (Godinez Depo. pp. 48-50). When he returned he asked Godinez if she would open the apartment for him so he could retrieve his belongings. (Id. p. 50-51). Godinez refused. Petersen continued to wait in the apartment complex office and used Godinez's cell phone and office phone multiple times in an attempt to contact Ms. Zdrantan. (Id. at pp. 53-56).

At approximately 11:53am, Petersen used Godinez's office phone to call the Center. He reported to Center employee Peter Dan that he was going to be late for his noon return deadline;

that he was near the Clackamas Town Center and that he didn't want to go back to jail. (Dan Depo. pp. 74-77; 84). Dan told him that if he was under three hours late he would receive a Major Violation but that he would not automatically be returned to jail. (Id. at p. 84). According to his deposition testimony, Dan was "trying to minimize, in [Petersen's] mind, how much trouble he's in, so to increase the chances that he would actually come back." (Id. at pp. 76-77). Dan's general sense was that Petersen was not going to return to the Center. (Id.). Dan documented the call and when, his co-worker, Doreen Dryer, returned from lunch at 12:30pm, they initiated the Unauthorized Departure process. (Dan Depo. pp. 54, 87-88; Dryer Depo. pp. 41-43).

Petersen's file was retrieved from Gorman and Dan informed Dryer that there were victims to be contacted. Dan assumed Dryer's front counter duties so that she could proceed with the UAD process. (Id.). At some point after 1pm, Dryer attempted to call the numbers listed in Petersen's file for Ms. Zdrantan but was told by Gorman that she had already tried the number and that it was not valid. (Dryer Depo. at pp. 46-47).

At, or shortly after, noon and after he had called the Center, Petersen saw Ms. Zdrantan returning to the apartment with A.B. (Petersen Decl. Ex. 2; Godinez Depo. p. 69-70). Ms. Zdrantan came to the apartment manager's office where Petersen was waiting. (Petersen Decl. ¶17; Godinez Depo. pp. 77) They argued briefly and then went together up to the second floor apartment. (Petersen Decl. ¶19; Godinez Depo. pp. 77-78). Approximately ten to fifteen minutes after Petersen and Ms. Zdrantan left Godinez's office, and no later than 1:10pm, Ms. Zdrantan's neighbor, Faith Molina, came down to Godinez's office to report that she had heard banging, fighting and screaming through the wall her apartment shared with Ms. Zdrantan's apartment. (Godinez Depo. p. 79).

According to Petersen, when his argument with Ms. Zdrantan escalated to physical violence, Ms. Zdrantan locked A.B. in her bedroom. (Petersen Decl. ¶ 20). Petersen testified that Ms. Zdrantan was dead within ten to fifteen minutes after they had entered the apartment.

At approximately 12:50pm, Petersen's neighbor and friend, Gabriel Guzman, ran into Petersen at the apartments. According to Guzman, he did not remember Petersen having any blood on him. Guzman testified that Petersen was smoking a cigarette and walked away from Guzman, ignoring him. (Guzman Depo. pp. 21, 41).

Starting at approximately 1:07pm a series of text messages were exchanged between Ms. Godinez and Ms. Zdrantan's cell phone. (Godinez Depo. 80-83). According to Petersen, he was using Ms. Zdrantan's phone to send the text messages. (Petersen Decl. ¶¶1-2).

Between 2pm and 3pm, Petersen brought A.B. to Molina's apartment. The following day Ms. Zdrantan's father, Stelian Zdrantan, discovered Ms. Zdrantan's body when he went to the apartment to pick up A.B. from Molina's home. Petersen was arrested in Washington two days later and was ultimately convicted of Aggravated Murder and sentenced in Washington County Circuit Court to true life without the possibility of parole.

## Claims

The First Claim for Relief, brought on behalf of the Estate, alleges a federal substantive due process claim under 42 U.S.C. §1983. The claim is premised upon allegations of "state-created danger;" the County's alleged customs and practices regarding the acceptance, release and monitoring of Center residents; and the County's failure to train its employees so as to prevent harm by Center residents.  The claim is brought against the individual Washington County employees and against Washington County and the Center on a *Monell* theory of

liability.

The Second Claim for Relief, brought on behalf of the Estate, asserts a claim for wrongful death under state law against all Defendants. Plaintiffs allege that Defendants failed to exercise reasonable care by releasing Petersen and failing to notify Ms. Zdrantan or her family that Petersen was on work release and became unaccounted for.

The Third Claim for Relief, brought on behalf of A.B., asserts a claim for Negligent Infliction of Emotional Distress. Plaintiffs allege that Defendants' negligent conduct resulted in the murder of Ms. Zdrantan; that her minor child, A.B., witnessed and perceived the serious physical injuries and death and that, as a result, A.B. suffered serious emotional distress.

## **Evidentiary Objections**

Both parties submitted numerous evidentiary objections. I have carefully reviewed the objections and concluded that many of the objections go to the weight and not the admissibility of the evidence. In addition, several of the objections are not articulated with sufficient specificity for me to determine the exact basis for the objection. I also conclude that, with few exceptions, admitting or excluding the objected to evidence would not affect my ultimate decision regarding summary judgment on Plaintiffs' claims.

Therefore, for the purposes of the motion for summary judgment, Plaintiffs' Objections to the Declaration of Eric Petersen and to Paragraph 12 of the Declaration of Steve Berger are overruled.

For the purposes of the motion for summary judgment, Defendants' evidentiary objections are overruled with the following exceptions: statements attributed to Bracken McKey in Exhibit 24 to John Coletti's Declaration; conclusions or opinions offered by Paige Light

regarding what, if anything A.B. contemporaneously witnessed or perceived; the Proposed

Expert Declaration of Jeffrey Schwartz; and contents of the public record attached to the

Declaration of Detective LaMonica that do not constitute "factual findings" under FRE

803(8)(c). This evidence is excluded and will not be considered by the Court in deciding the

present motion.


## Evaluating Motions for Summary Judgment

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue

exists regarding any material fact and the moving party is entitled to judgment as a matter of law.

The moving party must show the absence of an issue of material fact. *Celotex Corp. v. Catrett,*

477 U.S. 317, 325, 106 S.Ct. 2548 (1986). The moving party may discharge this burden by

showing that there is an absence of evidence to support the nonmoving party's case. *Id.* When the

moving party shows the absence of an issue of material fact, the nonmoving party must go

beyond the pleadings and show that there is a genuine issue for trial. *Id.*

The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

Reasonable doubts concerning the existence of a factual issue should be resolved against the

moving party. *Id.* at 630–31. The evidence of the nonmoving party is to be believed, and all

justifiable inferences are to be drawn in the nonmoving party's favor. *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). No genuine issue for trial exists, however, where

the record as a whole could not lead the trier of fact to find for the nonmoving party. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348 (1986).

<u>**Discussion**</u>

**I. Plaintiff Estate's Substantive Due Process Claim**

Plaintiffs allege that Defendants acted with deliberate indifference and affirmatively placed Ms. Zdrantan in a position of danger she would not otherwise have faced, "in an unjustified intrusion on [her] personal safety in violation of her substantive due process rights under the Fourteenth Amendment to the United States Constitution." (Pl.'s Fourth Am. Complaint at ¶ 46). Plaintiffs bring their claim pursuant to 42 U.S.C. §1983.

Plaintiffs allege that Defendants acted pursuant to an expressly adopted official policy or longstanding practice or custom and that the acts of the individual defendants and the policies, practices and customs of the County and the Center were the "moving force" that caused Ms. Zdrantan's death. (Id. ¶¶ 51-52, 55). Plaintiffs also allege that the training policies of the County and Center were not adequate. The Fourth Amended Complaint asserts individual constitutional claims against Defendants Dan, Gorman and Dryer; against the County and Center Defendants under a *Monell* theory of liability and against individual Defendants Berger and Mollahan under a supervisory theory of liability. The First Claim for Relief incorporates the factual paragraphs of the Complaint and then alleges, without particularity, that the conduct of all Defendants violated Ms. Zdrantan's substantive due process rights.[1]

Defendants assert that summary judgment is appropriate on Plaintiffs' constitutional claim because the evidence is insufficient to support any constitutional violation under a state-created danger theory; the evidence fails to demonstrate that any of the individual defendants acted with deliberate indifference and; at a minimum, these defendants would be entitled to qualified immunity.

---

[1] Plaintiffs subsequently withdrew their §1983 claim against Ms. Dryer. (Pls.' Response at p. 30, n. 8).

**A. State-Created Danger: Defendants Dan and Gorman**

The Fourteenth Amendment's Due Process Clause states: "... nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 2. This substantive due process right "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with the rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles,* 147 F.3d 867, 871 (9th Cir.1998) (quoting *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (internal citations omitted)).

42 U.S.C. § 1983 provides a cause of action against persons acting under color of state law who have violated rights guaranteed by the U.S. Constitution or federal statutes. 42 U.S.C. § 1983; *Wilder v. Virginia Hosp. Ass'n.*, 496 U.S. 498 (1990). To state a Section 1983 claim, a plaintiff must allege facts "which show a deprivation of a right, privilege or immunity secured by the Constitution or federal law by a person acting under color of state law." *Lopez v. Dep't of Health Servs.*, 939 F.2d 881, 883 (9th Cir. 1991)(citations omitted). In *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S. Ct. 998 (1995), the United States Supreme Court held that, in general, the due process clause of the Fourteenth Amendment does not create an affirmative duty on the part of the state to protect the life, liberty, or property of its citizens against invasion by private actors. The Court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S. Ct. at 1004. Accordingly, the general rule is that officials cannot be held liable under Section 1983 for an injury inflicted by a third party. *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992)(*"Grubbs I"*).

One of the two recognized exceptions to this rule is when "[u]nder the state-created

danger doctrine, a state actor can be held liable for failing to protect a person's interest in his personal security or bodily integrity when the state actor affirmatively and with deliberate indifference placed that person in danger." *Pauluk v. Savage*, 836 F.3d 1117, 1122 (9th Cir. 2016). Plaintiffs acknowledge that their federal claim relies on this exception.

To benefit from the state-created danger exception, Plaintiffs must show: (1) "affirmative conduct on the part of the state in placing the plaintiff in danger" and (2) "deliberate indifference" by the state to a "known or obvious danger." *Patel v. Kent School District,* 648 F.3d 965, 974 (2011) (internal quotation marks and citation omitted). Both requirements must be satisfied for the exception to apply. *Id.*

As to the first requirement, a plaintiff must show that the affirmative conduct placed her in a "worse position than that in which [s]he would have been had [the state] not acted at all." *Johnson v. City of Seattle*, 474 F.3d 634, 641 (9th Cir. 2007) (quoting *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998). In addition, "the affirmative act must have exposed the plaintiff to 'an actual, particularized danger,' and the resulting harm must have been foreseeable." *Pauluk*, 836 F.3d at 1125 internal citations omitted).

As to the second element, the Ninth Circuit has held that deliberate indifference is a stringent standard of fault that "requires a culpable mental state more than gross negligence. *Id.* at 1124–25 (citing *Patel*, 648 F.3d at 974; *L.W. v. Grubbs (Grubbs II)*, 92 F.3d 894, 900 (9th Cir.1996)). As explained in *Grubbs II,* the defendant must "recognize[ ] [an] unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Grubbs,* 92 F.3d at 899 (internal quotation marks omitted). Put another way, the defendant "knows that something *is* going to happen but ignores the risk and exposes [the plaintiff] to it." *Id.* at 900. Absent the requisite culpable mental state, there can be no

constitutional violation premised on state-created danger. *Pauluk*, 836 F.3d at 1132.

Plaintiffs assert that the affirmative acts taken by Defendant Gorman were accepting Petersen into the Center; entering invalid contact information for Ms. Zdrantan and releasing Petersen on a work pass. Plaintiffs assert that Defendant Dan's affirmative act was that on the morning of August 28, 2014, when Petersen called in to report he was in an unauthorized area, Dan told him that if he was under three hours late he would receive a Major Violation but that he would not automatically be returned to jail.

As an initial matter, I conclude that Plaintiffs have offered no evidence that Defendant Gorman was involved in "accepting" Petersen into the Center. The evidence supports only the conclusion that the screening that determines whether an inmate is eligible for transfer and is, in fact, transferred to the Center occurred prior to Defendant Gorman's contact with Petersen. Defendant Gorman's first contact with Mr. Petersen was the day after he transferred to the Center.

I also conclude that the Court need not delve into a lengthy analysis of the remaining alleged affirmative acts because Plaintiffs fail to establish a genuine issue of material fact as to the element of deliberate indifference. As explained below, even viewing the facts in the light most favorable to Plaintiffs, the record does not support their contention that Defendants acted with deliberate indifference to any known or obvious dangers.

Plaintiffs argue that Defendant Gorman acted with deliberate indifference because she was aware that unauthorized departures occurred frequently, that inmates were dangerous, that Ms. Zdrantan had an active restraining order against Petersen and that Petersen had been violating that restraining order by living with Ms. Zdrantan. The evidence demonstrates, however, that Defendant Gorman knew that Petersen had been successful in the program before

and nothing in his behavior, demeanor or responses during their meeting gave her any concern about his ability to participate successfully in Center programs. (Gorman Decl. p. 2; Gorman Depo. pp. 62-63). Petersen expressed his desires to find a job and reunite with his family. (Id.). Plaintiffs argue that Defendant Gorman "remained willfully and intentionally ignorant of the risks inmates posed to the community." (Pls.' Response at 38). Even viewing the evidence in a light most favorable to Plaintiffs, the record does not support a conclusion that Defendant Gorman recognized an "unreasonable risk" to Ms. Zdrantan and "actually intended to expose [Ms. Zdrantan] to such risks without regard to the consequences." *Grubbs,* 92 F.3d at 899. Plaintiffs' conclusory statements to the contrary cannot satisfy their burden to demonstrate a genuine issue of material fact as whether Defendant Gorman acted with deliberate indifference.

Likewise, Defendant Dan's conduct cannot be characterized as demonstrating the requisite "culpable mental state." *Patel,* 648 F.3d at 974. Plaintiffs allege that Defendant Dan was aware that the Center released high-risk and dangerous offenders, that unauthorized departures occurred frequently and that the Center had no way of knowing where residents were while on a work pass. Plaintiffs also allege that Defendant Dan knew that it was important to warn victims but that residents were routinely released without the Center having valid victim contact information. (Pls' Response at 38).

Plaintiffs contend that when Petersen called in to report he was in an unauthorized location, Defendant Dan's "conduct in telling Petersen he had a three-hour time line to commit the murder then enhanced Ms. Zdrantan's vulnerability and facilitated Petersen's crime." (Pls.' Response at 33). Contrary to Plaintiffs' assertions, the undisputed evidence reflects that Defendant Dan's conversation with Petersen was designed to encourage Petersen to return to the Center, and that Defendant Dan initiated the UAD process before Center policy would have

required based on his belief that Petersen would, despite their conversation, not return to the Center. Based on the record, no reasonable trier of fact could conclude that Defendant Dan's conduct was one of someone who "knows that something *is* going to happen but ignores the risk and exposes [the plaintiff] to it." *Grubbs,* 92 F.3d at 900. Plaintiffs raise no genuine issue of material fact that Defendant Dan acted with deliberate indifference to the safety of Ms. Zdrantan.

Because Plaintiffs have failed to show that there is a genuine issue of material fact regarding whether Defendants Gorman and Dan acted with deliberate indifference, they cannot establish that the state-created danger exception applies. As a result, no reasonable fact finder could conclude that Defendants' conduct was responsible for a deprivation of Ms. Zdrantan's constitutional rights under the Fourteenth Amendment. Accordingly, Defendants motion for summary judgment on Plaintiffs' First Claim for Relief as to Defendants Gorman and Dan is granted.

Having concluded that Plaintiffs have failed to produce evidence sufficient to establish the existence of a constitutional violation, I need not reach the question of whether the individual Defendants are entitled to qualified immunity. *Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016)(In determining whether qualified immunity applies, courts "must determine whether: (1) the facts adduced constitute the violation of a constitutional right; and (2) the constitutional right was clearly established at the time of the alleged violation.") . In any event, if the facts had created a constitutional violation, the individual defendants would be shielded from liability by qualified immunity.

## B. Supervisory and Monell Liability

A plaintiff may state a claim under Section 1983 against a supervisor for constitutional violations "if there exists either (1) his or her personal involvement in the constitutional

deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir.2011) (internal quotation marks and citation omitted).

Plaintiffs allege that Defendants Berger and Mollahan failed to train their employees and ratified official policies that resulted in a violation of Ms. Zdrantan's constitutional rights. Neither the Complaint nor Plaintiffs' Response to the Motion articulate with sufficient specificity or evidentiary support what particular conduct by these Defendants supports a claim for supervisory liability. In any event, my conclusion above that no reasonable trier of fact could conclude that the actions of Gorman and Dan rose to the level of a constitutional violation is fatal to Plaintiff's supervisory liability claim. *Id.* (actions against supervisors under section 1983 require that a sufficient causal connection is present and *the plaintiff was deprived under color of law of a federally secured right* (emphasis added)). Plaintiffs' claim against Defendants Berger and Mollahan thus fails as a matter of law.

In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018 (1978), the Supreme Court held that a municipality may not be held liable for a Section 1983 violation under a theory of respondeat superior for the actions of its subordinates. In order to establish municipal liability, a plaintiff must show that a "policy or custom" led to the plaintiff's injury. *Id.* at 694, 98 S.Ct. 2018. A plaintiff must also demonstrate that the policy or custom of a municipality "reflects deliberate indifference to the constitutional rights of its inhabitants." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1197 (1989).

Here, Plaintiffs allege that the County and Center Defendants' official policies, longstanding customs and practices, and failure to train its employees were the "moving force" behind the violation of Ms. Zdrantan's constitutional rights. However, Plaintiffs fail to provide

evidence that creates a genuine issue of material fact that the customs or policies they identify were adhered to with deliberate indifference. Even under the objective standard for determining whether a municipality is deliberately indifferent, a plaintiff must still establish that "the facts available to [ ] policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of [ ] constitutional rights. . . ." *City of Canton, Ohio,* 489 U.S. 378 at 396, 109 S.Ct. at 1208.

The evidence in the record before this Court reflects that the Center served over 2,000 individuals in 2014. (Berger Decl. p. 2). Plaintiffs cite to only five prior incidents in the last twenty years of serious crimes committed by residents of the Center, four of which occurred between 1994 and 2001. No incidents involving a Center resident using a release pass to commit a crime in the community occurred in the decade prior to the incident at issue here. (See generally, Plaintiffs' Response at 10-11 and record citations therein). The evidence simply does not support a conclusion that policymakers had actual or constructive notice that the policies at issue were "substantially certain to result in the violation of [ ] constitutional rights." *Id.* On the record before this Court, no reasonable trier of fact could conclude that the policies that facilitated the transfer of Petersen to the Center and his subsequent unsupervised release into the community on a work pass were effectuated with deliberate indifference to Ms. Zdrantan's constitutional rights or were the moving force behind her injuries.

Furthermore, the absence of an underlying constitutional violation defeats Plaintiffs' claims against the County and Center Defendants for failure to train. *See Monell*, 436 U.S. at 690, 98 S. Ct. 2036 ("touchstone of the § 1983 action against a government body is an allegation that official policy [or custom] *is responsible for a deprivation of rights protected by the Constitution . . . .*") (emphasis added); *City of Canton, Ohio*, 489 U.S. at 387, 109 S. Ct. at 1204

(1989)(constitutional wrong must be caused by the failure to train). As discussed above, the conduct of the individual employee Defendants did not cause a constitutional violation and thus liability may not attach to the County and Center Defendants based on a failure to train those employees.

Much like the circumstances faced by numerous courts around the country, Ms. Zdrantan's tragic death was preceded by a series of actions by government actors that have been the subject of criticism. *See, Steinle v. City & Cty. of San Francisco*, 230 F. Supp. 3d 994, 1003 (N.D. Cal. 2017), *DeShaney* 489 U.S. at 202–03, 109 S. Ct. at 1006–07; *Pauluk*, 836 F.3d at 1132. However, as in those cases, this Court recognizes that it cannot yield toward the impulse of sympathy for the victims and must determine only whether the law allows Plaintiffs to proceed with their claim based on the legal theories alleged. I conclude that no reasonable fact finder could conclude that the Defendants' conduct, policies or practices deprived Ms. Zdrantan of her substantive due process rights in violation of the Fourteenth Amendment. Accordingly, Defendants' motion for summary judgment on Plaintiffs' First Claim for Relief is granted.

## II. Plaintiff Estate's Wrongful Death Claim

This Court has supplemental jurisdiction over Plaintiffs' state law claims and it is within the Court's discretion to retain jurisdiction over the state law claims even if the federal claims are dismissed. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S. Ct. 1130, 1139 (1966). In determining whether to retain jurisdiction, the Court considers issues of judicial economy, convenience, and fairness. *Id.* After considering these factors, the Court concludes that it will retain jurisdiction over Plaintiffs' state law claims.

Plaintiffs' allegations that Defendants negligently caused Ms. Zdrantan's death fall into two main categories: permitting Petersen to leave the Center and failing to warn Ms. Zdrantan or

her family. Specifically, Plaintiffs allege that Defendants failed to exercise reasonable care to protect Ms. Zdrantan from harm by: 1) permitting Petersen to leave the custody and control of the Center unsupervised; 2) permitting Petersen to leave the Center without an electronic monitoring device; 3) permitting him to leave the Center when "defendants knew or should have known that he had a violent history and was a credible threat to Ms. Zdrantan and her family" and there was an outstanding no-contact order against him; 4) permitting Petersen to leave the Center without verifiable employment; 5) failing to contact Ms. Zdrantan to notify her that Petersen was transferred to the Center, that he was in the community unsupervised on work release, or that he had notified Defendants he was in an unauthorized area; 6) waiting three hours before attempting to notify Ms. Zdrantan and her family that Petersen's location was unaccounted for; 7) failing to ensure they had updated contact information; and 8) failing to attempt to contact Ms. Zdrantan's family or make other efforts to reach her once their initial efforts had failed.

Defendants assert that summary judgment is appropriate on this claim because Oregon's law on discretionary immunity protects from liability the policy decisions made by governmental defendants and followed by their employees. Therefore, according to Defendants, negligence based on permitting Mr. Petersen to leave the Center is barred by discretionary immunity. Defendants further assert that negligence based upon a failure to warn theory fails because there is no triable issue of fact as to causation.

## A. Permitting Petersen to Leave the Center

Under Oregon law:

Every public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for:
* * * *

(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.

ORS § 30.265(6)(c).

Discretionary immunity applies if a governmental person or entity made a policy choice among alternatives, with the authority to make that choice. *Garrison v. Deschutes County,* 334 Or. 264, 273–75 (2002); *Mosley v. Portland School Dist. No. 1J,* 315 Or. 85, 89–90, 92 (1992). Discretionary immunity does not apply to "routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action." *Lowrimore v. Dimmitt,* 310 Or. 291, 296, 797 P.2d 1027 (1990). "Once a discretionary choice has been made, the immunity follows the choice. It protects not only the officials who made the decision, but also the employees or agents who effectuate or implement that choice in particular cases. Only if an employee or agent makes an additional choice—one that is not subject to discretionary or other immunity—can there be liability. In that circumstance, liability attaches to the nonimmune choice and only to the nonimmune choice." *Westfall v. State ex rel. Oregon Dep't of Corr.,* 355 Or. 144, 161, 324 P.3d 440, 449 (2014).

In order to demonstrate their entitlement to discretionary immunity, Defendants must prove that the conduct was the product of a decision, that the decision is a policy decision, and the decision must have been made by a governmental decision-maker with the authority to make that type of decision. *Robbins v. City of Medford*, 284 Or. App. 592, 597 (2017). In reviewing the record, I agree with Defendants that in light of the allegations in Plaintiffs' Fourth Amended Complaint, they were not required to produce additional evidence as to how the policies were created. (*See* Plaintiffs' Response at p. 55). Plaintiffs have admitted, and the evidence supports the conclusion, that the individual Defendants acted pursuant to the official and/or longstanding

policies of the County and Center. Plaintiffs also admit, and the evidence demonstrates, that these policies, set out in the Center's Staff Policy and Procedures Manual and Residential Counselor's Manual, were promulgated and maintained by final policymakers. (4th Am. Compl. ¶¶ 27-28, 37, 53, 54; Mollahan Depo. pp. 7, 8, 125; Hartner Depo. pp 8-11, 15).

Nonetheless, after a thorough review of the record and viewing the undisputed evidence in a light most favorable to the Plaintiffs, I conclude that a reasonable jury could find that the conduct of Center employees with respect to Petersen was not entitled to discretionary immunity either because those employees failed to follow policy or because they were left to make additional choices not subject to discretionary immunity. Because there is a genuine issue of material fact as to this aspect of the claim, summary judgment is not appropriate.

## B. Failure to Warn

In order to sustain their wrongful death claim, Plaintiffs must prove that the Defendants' acts or omissions caused Ms. Zdrantan's death. Plaintiffs assert that Defendants' failure to warn Ms. Zdrantan was the cause of her death. Defendants argue that under Oregon law, a failure to warn someone of knowledge they already have does not support liability.

In *Fuhrer v. Gearhart-By-The-Sea, Inc.,* 306 Or. 434 (1988), the Oregon Supreme Court explained that "[t]he risk in a failure-to-warn case is not the hazard itself, but the chance that someone predictably will be exposed to danger, be it rape or dangerous surf, if no warning is made." *Id.* at 438. The Court concluded that

> A defendant may be liable if the defendant can reasonably foresee that there is an unreasonable risk of harm, a reasonable person in the defendant's position would warn of the risk, the defendant has a reasonable chance to warn of the risk, the defendant does not warn of the risk, and the plaintiff is injured as a result of the failure to warn.

*Id.* at 438-439. However, the Court went on to explain that if the danger was apparent to the

plaintiff, a warning would not have made [the plaintiff] more aware of the danger, and the failure to warn [the plaintiff] did not expose him to any greater risk of harm than if he had been warned." *Id.* at 439. In *Fuhrer*, the Court found that because it was not known whether the danger was apparent to the deceased plaintiff or whether he would have taken another course of action if warned, a trier of fact could conclude that "a warning could have made a difference." *Id.* at 439-440.

Defendants rely on the Oregon Supreme Court's later decision in *Garrison*, to argue that "Oregon law is clear that failing to warn someone of knowledge they already have does 'not expose [them] to any greater risk of harm than if [they] had been warned,' and therefore, cannot support liability." (Def. Motion at 26, quoting but not citing *Garrison*, 334 Or. at 271). However, in *Garrison,* both the Court of Appeals and the Oregon Supreme Court had the benefit of the plaintiffs' own testimony that they were well aware of the risk. The Court of Appeals decision, which was upheld by the Oregon Supreme Court, specifically held that, "*On this record, it is impossible to see how a warning sign would have altered plaintiffs' behavior in any way* or how the absence of a warning exposed plaintiffs to any greater risk of harm than if they had been warned." *Garrison,*162 Or. App. at 169 (emphasis added).

Based on the record before this Court and the guidance of the Oregon cases discussed above, I conclude that there are genuine issues of material fact regarding whether the Defendants' failure to warn Ms. Zdrantan exposed her to a greater risk of harm than if she had been warned. There is undisputed evidence that Ms. Zdrantan, through her attendance at the probation violation hearing on August 18, 2014, had some knowledge that Petersen would be transferred to the Center. It also undisputed that, through her encounters with Petersen along the Tualatin Valley Highway and in the apartment manager's office on August 28, 2014, she had

knowledge that Petersen was out in the community on the day of her murder. However, that evidence, viewed in a light most favorable to Plaintiffs does not compel the conclusion that Ms. Zdrantan was "fully aware" of the danger  or that the Defendants' failure to warn Ms. Zdrantan did not expose her to any greater risk of harm than if she had been warned. A reasonable juror could conclude that a warning or warnings from Defendants could have "made a difference" and that the failure to warn was a cause-in-fact of Ms. Zdrantan's injuries.

For these reasons, and for the reasons discussed above in II.A., Defendants' motion for summary judgment on Plaintiffs' Second Claim for Relief is denied.

**III. Plaintiff A.B.'s Negligent Infliction of Emotional Distress Claim**

Plaintiffs allege a negligent infliction of emotional distress claim on behalf of A.B., the minor child of Ms. Zdrantan and Petersen. Plaintiffs allege that the Defendants negligently caused Ms. Zdrantan's murder by a third person, Petersen, and that A.B. witnessed Ms. Zdrantan's serious injuries and death as they occurred.

Defendants assert that summary judgment is appropriate on this claim because it both fails on the merits and is barred by timely lack of notice under the Oregon Tort Claims Act.

The NIED claim here finds its basis in an exception to the physical injury rule for emotional distress damages that was carved out by the Oregon Supreme Court in *Philbert v. Kluser*, 360 Or. 698, 712-713 (2016). In *Philbert*, the court considered recovery of emotional distress damages in a bystander situation and allowed recovery where "a defendant negligently causes foreseeable, serious emotional distress and also infringes some other legally protected interest." *Id.* at 702 (internal quotation marks and citations omitted). The legally protected interest identified there was "the interest in avoiding being a witness to the negligently caused traumatic injury or death of a close family member." *Id*. at 707.

Under Oregon law, a bystander may recover if: (1) the bystander witnesses a sudden, serious physical injury to a third person negligently caused by the defendant;" (2) the bystander suffers serious emotional distress; (3) the bystander perceives the events that caused injury to the third person as they occurred. (4) the bystander is a close family member of the person suffering the bodily injury. *Id.* at 712-714 (emphases omitted).

Defendants argue that because A.B. was locked in the bedroom during the murder of Ms. Zdrantan and observed, at most, the aftermath of the murder, the first element is not satisfied because A.B. did not "witness" the serious physical injury. Plaintiffs assert that there are genuine issues of material fact regarding what A.B. witnessed and, even under Defendants version of events, A.B. "perceived" her mother's death as it occurred because she could hear what was happening through the bedroom door.

It is undisputed that A.B. was in the apartment during her mother's murder. The evidence also supports the conclusion that she would have had to pass through the apartment after the murder when Petersen brought her to Ms. Molina's apartment. The only admissible evidence regarding whether A.B. witnessed the murder contemporaneously is the Declaration from Petersen that A.B. was locked in the bedroom during his fight with Ms. Zdrantan. The evidence presented through Mr. Zdrantan and A.B.'s therapist, Paige Light, upon which Plaintiffs rely, is largely inadmissible and is, in any event, insufficient to create a genuine issue of material fact as to whether A.B. witnessed the murder contemporaneously.

Plaintiffs' assert that even A.B.'s perception of the murder through the closed door is sufficient to support her NIED claim. I disagree. Citing cases from California, Plaintiffs argue that "perception" is not limited to visual observance of the event. However, those cases applied different factors in evaluating whether a defendant should reasonably foresee injury to a plaintiff

and are, in any event, not controlling case law. *See, e.g. Ochoa v. Superior Court,* 39 Cal. 3d 159, 166, 703 P.2d 1 (1985)(describing the factors set out in *Dillon v. Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]).

Under Oregon law, a plaintiff may recover under the bystander rule if she "*witnesses* a sudden, serious physical injury to a third person negligently caused by the defendant." *Philbert*, at 712 (emphasis added). To require that a plaintiff "witness" the event in the first element and then remove that requirement in the third element by allowing "perception" to encompass awareness garnered through some means other than a visual observation is not logical and I decline to expand the *Philbert* rule in such a way. Accordingly, Defendants' motion for summary judgment as to Plaintiff's Third Claim for Relief is granted.

Having concluded that Plaintiffs' NIED claim fails on the merits, I need not and do not reach the issue of whether the claim is barred by lack of timely notice under the Oregon Tort Claims Act.

## Conclusion

For the reasons set out above, Defendants' motion for summary judgment (Dkt. #71) is GRANTED in part and DENIED in part. Plaintiffs' First and Third Claims for Relief are DISMISSED.

DATED this 9th day of August, 2018.

　　　　　/s/ John Jelderks
John Jelderks
U.S. Magistrate Judge